# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**Jeremy Didier,**

        **Plaintiff,**

**v.**                                  **Case No. 13-CV-2046**

**Abbott Laboratories;**
**Abbott Laboratories, Inc.;**
**Abbott Products, Inc.; and**
**Abbvie, Inc.,**

        **Defendants.**

## MEMORANDUM & ORDER

Plaintiff Jeremy Didier filed this lawsuit against her former employer and related entities asserting claims of sex discrimination, religious discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and claims of interference and retaliation pursuant to the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 et seq. This matter is presently before the court on defendants' motion for summary judgment on all claims (doc. 78). As explained below, the motion is granted.

## I.    Facts

The following facts are uncontroverted, stipulated in the pretrial order, or related in the light most favorable to plaintiff as the nonmoving party. Plaintiff Jeremy Didier was hired by Solvay Pharmaceuticals, Inc. as a sales representative in April 2002 and she continued as a Solvay employee through February 15, 2010 when Solvay was acquired by defendant Abbott

Laboratories. At that time, plaintiff became an Abbott employee until the termination of her employment on March 8, 2012.[1]

In April 2009, plaintiff was promoted to the position of Kansas City District Manager for the Pharmaceutical Products Division ("PPD"), Metabolic Franchise. She reported directly to K. Byron Rex, the Regional Manager of the West Region, PPD, Metabolic Franchise who, in turn, reported to Marty Comer. Mr. Rex is a member of the Church of Jesus Christ of Latter Day Saints, commonly called the Mormon Church, and plaintiff is a non-Mormon. Over the course of their working relationship, plaintiff and Mr. Rex talked frequently about their children and their personal lives and Mr. Rex knew that plaintiff was not Mormon. Mr. Rex made the decision to promote plaintiff to the District Manager position and, according to plaintiff, he expressed concern during the interview over whether plaintiff was being "stretched too thin" because both she and her husband worked full-time and had 4 young children at home. Plaintiff assured Mr. Rex that she could handle the position.

While plaintiff was employed by Solvay, she became familiar with Solvay's policy regarding expenses relating to travel and entertainment. Solvay's written policy stated that employees were to incur only those travel and entertainment expenses that were reasonable and necessary to conduct business. While the policy did not establish a "per diem" amount for reasonable expenses, it set forth guidelines for what Solvay considered reasonable amounts to

---

[1] When Abbott Laboratories acquired Solvay, plaintiff became an employee of defendant Abbott Products, Inc. (a subsidiary of Abbott Laboratories). Effective December 26, 2011, plaintiff became an employee of defendant Abbott Laboratories Inc. As of January 1, 2013, defendant AbbVie Inc. assumed certain liabilities of Abbott Laboratories Inc., including the liabilities arising out of this lawsuit. For purposes of summary judgment, the court refers to the defendants collectively as "Abbott."

spend on meals when traveling on company business—$15 for breakfast; $20 for lunch; and $50 for dinner. Abbott also maintains a policy concerning travel and entertainment expenses known as the T&E policy. That policy requires supervisor approval of all corporate expenses, prohibits the use of a corporate charge card for personal expenses, prohibits corporate reimbursement or payment of personal expenses, and prohibits corporate reimbursement or payment of expenses incurred for anyone other than the Abbott employee except that a meal for a spouse is reimburseable or payable by Abbott if the spouse is required to attend a business-related event.[2] A dinner expense is generally only reimbursable or payable by Abbott when the employee is traveling overnight on a business trip, but a dinner expense is also reimbursable or payable by Abbott when an employee arrives home late due to work so long as the employee properly annotates the expense in the "explanation" section of the expense report. Abbott's written T&E policy does not provide a "per diem" for meals but instead directs employees to exercise good judgment in terms of what is reasonable. The record reflects that plaintiff, as a District Manager, would complete her expense reports online and fax her receipts with the submission of the expense report. Once the expense report and receipts were submitted online, Mr. Rex, as plaintiff's supervisor, would open the report online, review the report and receipts, and either

---

[2]The record reflects that Abbott encouraged its employees to use a corporate American Express card for business-related expenses and that, once those expenses were approved, Abbott would pay American Express directly for those corporate expenses. Abbott's policy prohibited employees from using a corporate American Express card for personal expenses. The employee was required to pay American Express for any personal expenses on the corporate card, or expenses that were not approved by a supervisor. Abbott prohibited the use of corporate cards for personal expenses because Abbott's credit rating was affected when employees failed to pay off their personal expenses in a timely fashion. That being said, many employees used a personal credit card for all expenses, both corporate and personal, and then sought reimbursement from Abbott for corporate expenses that the employee had paid on the card.

approve the expenses or decline to approve the expenses. Once Mr. Rex approved the expenses, they were forwarded to the appropriate department for reimbursement or payment. Plaintiff's expense reports and receipts, then, were sent to Mr. Rex as the first step in the reimbursement/payment process.

According to plaintiff, Solvay and Abbott permitted employees to follow certain "unwritten guidelines" in terms of how the written T&E policies were applied to certain situations. Plaintiff testified that employees had wide latitude in applying the "suggested" per diem amounts to travel expenses such that she could apply that amount toward the cost of a meal that she could either eat by herself or share with her family. According to plaintiff, she occasionally purchased food at a fast food restaurant on the way home from a day of traveling and she would share that meal with her family. Plaintiff testified that she never made any attempt to disguise those receipts or expenses (or the number of entrees for which she was seeking reimbursement or payment) and that such expenses were routinely approved by Mr. Rex during the three years when he supervised her employment—both at Solvay and Abbott. Mr. Rex testified that he was unaware that he had approved expenses for family meals.

Abbott also requires its employees to make all business travel arrangements through Abbott's authorized travel agency. To the extent an employee books airline tickets outside of Abbott's authorized travel agency, that employee is required to submit a Travel Agency Exception Form with his or her expense report for corporate reimbursement or payment. That form requires, among other things, an explanation from the employee as to why the tickets were booked through an alternate channel and a signature from the employee's supervisor. Plaintiff was aware of this policy. A Travel Agency Exception Form is submitted by an employee just

like expenses are submitted—the Form is submitted online and awaits the supervisor's approval before the Form is forwarded on for reimbursement or payment.

In November 2011, plaintiff contacted Mr. Rex about a family emergency relating to her two young sons and she requested time off from to work to deal with the situation. Mr. Rex told plaintiff to take the time she needed to deal with the family emergency and he directed her to call Abbott's toll-free Human Resources hotline for employee assistance and he encouraged her to apply for an FMLA leave of absence. Plaintiff sought intermittent leave under the FMLA to care for her sons for a few hours each week. Abbott's Leave Center granted her request beginning November 7, 2011.

In December 2011, plaintiff submitted to Abbott expenses for gift baskets that she had purchased for her sales team. Plaintiff previously had been counseled by Mr. Rex on several occasions not to purchase gift baskets and similar items for her team and he had declined to approve such expenses in the past. In any event, the December 2011 gift basket expense was flagged by an automated system utilized by Abbott's Corporate Disbursement Department and that department decided to monitor whether Mr. Rex approved the expense. When Mr. Rex declined to approve the expense, Susan Ballard, a disbursement analyst in the Corporate Disbursement Department, conducted an initial review of plaintiff's expense submissions and identified that plaintiff frequently submitted meals for corporate reimbursement or payment but rarely had an overnight stay. Based on this initial review and the attempted gift basket expense, Ms. Ballard initiated a two-year audit of plaintiff's expenses beginning January 10, 2012. Ms. Ballard summarized her audit findings and, on January 26, 2012, submitted a Corporate Disbursement Case Report to Abbott's Office of Ethics and Compliance (OEC) for further

investigation into potential misrepresentation of expenses by plaintiff. The OEC is charged with ensuring compliance with Abbott's Code of Business Conduct. There is no evidence that Mr. Rex or Mr. Comer had any knowledge that the Corporate Disbursement Department was reviewing plaintiff's expenses or that it had asked the OEC to investigate further.

Meanwhile, on January 13, 2012, Mr. Rex discussed with plaintiff two specific concerns he had about her January 12, 2012 expense report. First, he was concerned that plaintiff had submitted a Travel Agency Exception Form, which required Mr. Rex's signature indicating his approval, without obtaining Mr. Rex's signature. Rather than obtaining Mr. Rex's signature for the form, plaintiff instead wrote Mr. Rex's name on the signature line and indicated that his signature was "on file." Nonetheless, he discussed the reasons why plaintiff had needed to use alternative travel arrangements and asked her to revise and resubmit the form, which he signed. Plaintiff then submitted the revised Travel Agency Exception Form, including Mr. Rex's signature, and Mr. Rex forwarded that form on for reimbursement or payment by Abbott. According to plaintiff, she used the Exception Form after making travel arrangements through the United Airlines app on her phone. Plaintiff testified that she had tried to access Abbott's travel department online, but kept getting "kicked off" the system due to heavy year-end web traffic. She further testified that she wrote Mr. Rex's name on the line, knowing full well that he would necessarily see that she had done that, to expedite the approval process for Mr. Rex who, according to plaintiff, was often slow to sign documents relating to expenses.

Second, Mr. Rex was concerned that plaintiff had submitted for corporate reimbursement or payment a dinner on January 2, 2012 for her family in the amount of $53.53. The record reflects that Mr. Rex was concerned about this expense both because plaintiff had written

"family" in the comment section next to the particular expense and because the expense was dated January 2, 2012 which was a company holiday and plaintiff had not been traveling for work that day. According to plaintiff, Mr. Rex said to her, "Please tell me we've not been paying for dinners for your family all this time." Plaintiff advised Mr. Rex that, in fact, Mr. Rex had been approving family dinner expenses for years (as had plaintiff's prior supervisors) and that such approval was consistent with her understanding of the T&E policy. Plaintiff testified that she was surprised that Mr. Rex's understanding of the policy was different and that it seemed as if Mr. Rex was not aware that he had been approving expenses for family dinners. Plaintiff further testified that she believed she could expense the meal because, although she did not work on January 2, 2012, she had an early morning flight the next morning.

Plaintiff testified that, after her discussion with Mr. Rex, she contacted Abbott's Corporate Disbursement Call Center because she was concerned that maybe she violated company policy concerning the expensing of family meals. On January 16, 2012, plaintiff had a conversation with DeMario Hudson, a call center representative. According to plaintiff, Mr. Hudson confirmed her understanding of the T&E policy and told her that she could expense a family meal in a reasonable amount as long as she was traveling out-of-town for at least 5 hours on the day of the meal and that it was within her manager's discretion to approve a family meal expense on the evening before an early morning departure. That same day, plaintiff e-mailed to Mr. Rex a summary of her conversation with Mr. Hudson. Because the information provided by Mr. Hudson to plaintiff did not seem accurate to Mr. Rex, Mr. Rex forwarded the e-mail to Mr. Hudson and asked him to verify that plaintiff's summary of the conversation was accurate. Mr. Hudson reported to Mr. Rex that plaintiff's summary was not accurate. Abbott's evidence

reflects that Mr. Hudson and plaintiff did not discuss the expensing of family meals. After Mr. Rex informed plaintiff that Mr. Hudson had disagreed with her summary of their conversation, plaintiff called Mr. Hudson and, on January 21, 2012, sent an email to Mr. Rex stating that Mr. Hudson had "confirmed" that what she had written was accurate. At all times, Mr. Hudson denied to Abbott that he had discussed with plaintiff the expensing of family meals.

On January 24, 2012, Mr. Rex contacted Abbott's myHR department about plaintiff's January 12, 2012 expense report (specifically, about the fact that she had written his name on the manager signature line without his consent and had submitted a meal for herself and her family on a day she was not working). He further expressed concern that plaintiff had misrepresented the substance of her conversation with Mr. Hudson. Cherylle LaFleur, one of Abbott's Employee Relations managers, was assigned to address Mr. Rex's concerns and Mr. Rex provided her with the Travel Agency Exception Form, the meal receipt in question and the e-mails concerning plaintiff's discussion with Mr. Hudson. In addition, Ms. LaFleur contacted Ms. Ballard in the Corporate Disbursement Department for clarification on certain expense practices. At that time, Ms. LaFleur learned that the Corporate Disbursement Department had separately initiated its own audit of plaintiff's expenses and that Ms. Ballard was in the process of referring the case to the OEC for further review. On January 26, 2012, Ms. LaFleur submitted a New Case Report to the OEC for further investigation into whether plaintiff had falsified her manager's signature/approval on a company document; whether she had submitted improper expenses; and whether she had intentionally misrepresented what Mr. Hudson had said in an effort to buttress her position relating to the family meal expense.

The OEC assigned Julie Fendel to investigate the allegations submitted by Ms. Ballard and Ms. LaFleur. Ms. Fendel works as an Investigator in Abbott's Global Security department. Global Security is responsible for conducting investigations into allegations of loss incidents within Abbott. As part of that investigation, Ms. Fendel interviewed plaintiff. In her interview, plaintiff admitted that she often submitted family meals for corporate reimbursement or payment and explained that her understanding of the policy permitted those expenses. Plaintiff also explained that, to her knowledge, many other Abbott employees shared the same understanding of the policy and expensed family meals and that they had done so with Solvay as well. Mr. Rex and Mr. Comer confirmed, however, that Solvay did not permit employees to expense family meals. Plaintiff also declined Ms. Fendel's invitation to provide her with the names of employees who shared her understanding of the policy concerning family meals in light of the fact that Ms. Fendel promised to investigate the expense reports of any employees identified by plaintiff. Abbott did not otherwise attempt to determine whether any other District Managers shared plaintiff's understanding of the T&E policy as it related to the expensing of family meals.

Ultimately, Ms. Fendel concluded, in a thorough written report, that plaintiff had improperly submitted multiple personal, family meals for reimbursement or payment by Abbott; that her explanation that she believed that expensing family meals was an 'Abbott perk" was not credible; and that her conduct violated Principle 5 of Abbott's Code of Business Conduct ("Accuracy and Integrity of Books, Records, and Accounts"). Ms. Fendel also concluded that plaintiff did not follow appropriate procedures regarding the Travel Agency Exception Form and that she tried to circumvent the system by writing that Mr. Rex's signature was "on file" in

violation of Principle 9 of the Code of Business Conduct ("Compliance with Abbott Standards, Policies and Procedures").

Based on Ms. Fendel's findings and her own analysis of the facts, Ms. LaFleur recommended the termination of plaintiff's employment. Ms. LaFleur also discussed the results of the investigation with Mr. Rex and Mr. Comer, both of whom agreed with the termination decision. Abbott terminated plaintiff's employment on March 8, 2012. Additional facts will be provided as they relate to the specific arguments raised by the parties in their submissions.

## II.     Summary Judgment Standard

"Summary judgment is appropriate if the pleadings, depositions, other discovery materials, and affidavits demonstrate the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Water Pik, Inc. v. Med–Systems, Inc*., 726 F.3d 1136, 1143 (10th Cir. 2013) (quotation omitted); *see* Fed. R. Civ. P. 56(a). A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Water Pik, Inc*., 726 F.3d at 1143 (quotation omitted). "The nonmoving party is entitled to all reasonable inferences from the record; but if the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue." *Id*. at 1143-44.

## III.    Sex Discrimination Claim[3]

In the pretrial order, plaintiff asserts that defendants terminated her employment on the basis of her sex.  In their motion for summary judgment, defendants, using the burden-shifting framework developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), assert that plaintiff cannot establish a prima facie case of discrimination and cannot show that defendants' articulated reasons for terminating plaintiff's employment are pretextual.  As an initial matter, plaintiff contends that she has come forward with direct evidence of discrimination, thus obviating the need for the *McDonnell Douglas* analysis.  *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) (holding that the *McDonnell Douglas* framework does not apply once plaintiff has presented direct evidence of discrimination).  Specifically, plaintiff points to the following evidence as "direct" evidence of discrimination:

> Plaintiff testified that in April 2009, when Mr. Rex promoted her to the District Manager position, he expressed concern over whether she was being stretched too thin because both she and her husband worked full-time and had 4 young children at home;
>
> plaintiff testified that during the investigation into her expense practices, Mr. Rex told her to "focus on her family and her faith" and wanted reassurance from plaintiff that her husband had a good job and that they "would be okay" if her employment was terminated;
>
> Terri Garrett, the woman who replaced plaintiff in the District Manager position after plaintiff was fired, testified that she resigned her employment in part because she was concerned about Mr. Rex's attitude toward working mothers and his apparent concern whether women employees with young children at home could be focused and committed to their jobs; and

---

[3] In their submissions, both Abbott and plaintiff analyze plaintiff's sex and religious discrimination claims together.  As indicated below, this is inappropriate as plaintiff's religious discrimination claim is essentially a "reverse discrimination" claim requiring a separate analysis.

Torrie Fenton-Oswald, a sales representative who worked under Mr. Rex's supervision in 2001, averred that Mr. Rex, in 2001, expressed his belief to her that women with young children should stay home with their children.

As will be explained, none of the evidence set forth by plaintiff constitutes direct evidence of discrimination.

According to established Tenth Circuit precedent, a "plaintiff proves discrimination by direct evidence when she presents proof of 'an existing policy which itself constitutes discrimination,'" *see Stone v. Autoliv ASP, Inc*., 210 F.3d 1132, 1136-37 (10th Cir. 2000) (citations omitted), or when she presents proof that the employer actually relied on a protected characteristic in making its employment decision (*i.e*., a statement by a decisionmaker during the decisional process showing discriminatory animus), *see Ramsey v. City and County of Denver*, 907 F.2d 1004, 1008 (10th Cir.1990) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989)). As recently explained by the Tenth Circuit:

> Comments in the workplace that reflect personal bias do not qualify as direct evidence of discrimination unless the plaintiff shows the speaker had decisionmaking authority and acted on his or her discriminatory beliefs. We also have explained that discriminatory statements do not qualify as direct evidence if the context or timing of the statements is not closely linked to the adverse decision. Furthermore, if the content and context of a statement allow it to be plausibly interpreted in two different ways—one discriminatory and the other benign—the statement does not qualify as direct evidence.

*Tabor v. Hilti, Inc*., 703 F.3d 1206, 1216 (10th Cir. 2013) (citations omitted). Plaintiff's evidence does not reflect an existing policy of discrimination, does not reflect discriminatory statements by Mr. Rex made during the decisional process and does not reflect that plaintiff's termination was, in fact, based on her sex. Rather, plaintiff's evidence, without exception, requires the trier of fact to draw an inference that plaintiff's termination was based on her sex in

light of purported statements made by Mr. Rex outside the context of plaintiff's termination. By definition, then, such evidence is, at best, circumstantial. *See Stone*, 210 F.3d at 1136-37 (evidence is not direct evidence if it requires a trier of fact to infer discrimination); *Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204 (10th Cir. 1999) (statements of personal opinion do not constitute direct evidence of discrimination).

Plaintiff contends that her evidence is "on par" with evidence that the Tenth Circuit deemed "direct evidence" in *Tabor*. Plaintiff's evidence is easily distinguishable from the evidence in *Tabor*. In that case, the decisionmaker—during the very interview for the position for which plaintiff had applied—made statements expressing discriminatory beliefs about whether women were capable of doing the job at issue. *Tabor*, 703 F.3d at 1217. In concluding that the plaintiff had come forward with direct evidence of discrimination, the Circuit emphasized that the content of the statements, together with the fact that they were made in the context of the job interview in close proximity to the adverse employment decision, was sufficient to directly link the statements to the adverse decision. *Id.* The combination of those elements is missing from plaintiff's evidence. Ms. Fenton-Oswald's testimony relates to a period of time more than 10 years prior to the decision at issue here. Mr. Rex's alleged statements to plaintiff in April 2009 were made three years prior to plaintiff's termination and, in any event, were not made in the context of an adverse action—Mr. Rex promoted plaintiff to the District Manager position. The comments that Mr. Rex allegedly made to plaintiff during the investigation could just as plausibly be interpreted as benign rather than discriminatory. And the testimony of Ms. Garrett concerns alleged statements made as much as 18 months after plaintiff's termination and did not concern plaintiff's situation in any respect.

13

For the foregoing reasons, the court will analyze defendant's motion for summary judgment on plaintiff's discrimination claims under the *McDonnell Douglas* standard. Under *McDonnell Douglas*, plaintiff has the initial burden of establishing a prima facie case of discrimination. *See Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 627 (10th Cir. 2012). To set forth a prima facie case of discrimination, plaintiff must establish "(1) membership in a protected class and (2) an adverse employment action (3) that took place under circumstances giving rise to an inference of discrimination." *Id.* (citing *EEOC v. PVNF, LLC*, 487 F.3d 790, 800 (10th Cir. 2007)). If she establishes a prima facie case, the burden shifts to defendant to assert a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If defendant meets this burden, summary judgment against plaintiff is warranted unless she introduces evidence "that the stated nondiscriminatory reason is merely a pretext for discriminatory intent." *Id.* (citing *Simmons v. Sykes Enters.*, 647 F.3d 943, 947 (10th Cir. 2011)).

A.      *Plaintiff's Prima Facie Case*

In their motion for summary judgment, defendants contend that plaintiff cannot establish a prima facie case of sex discrimination because she cannot show that any similarly situated employees outside of her protected classes were treated differently. The Tenth Circuit has repeatedly cautioned that comparison to similarly situated employees is not required as part of a plaintiff's prima facie case and that the relevant prima facie element may be framed more broadly, requiring only a "showing of circumstances giving rise to an inference of discrimination." *See Sorbo v. United Parcel Serv.*, 432 F.3d 1169, 1173 (10th Cir. 2005) (collecting cases); *English v. Colo. Dept. of Corrs.*, 248 F.3d 1002, 1008 (10th Cir. 2001) (In

14

disciplinary discharge cases, a "plaintiff does not have to show differential treatment of persons outside the protected class to meet the initial prima facie burden under *McDonnell Douglas*."). To raise an inference of discrimination at the prima facie stage in a discriminatory discharge case, a plaintiff's burden is not onerous—she need only show that she belongs to a protected class; that she was qualified for her job; and that the job was not eliminated after her discharge. *Kendrick v. Penske Transp. Servs., Inc*., 220 F.3d 1220, 1229 (10th Cir. 2000); *Perry v. Woodward*, 199 F.3d 1126, 1138 (10th Cir. 1999); *see also Nguyen v. Gambro BCT, Inc*., 242 Fed. Appx. 483, 487-89 (10th Cir. 2007) (prima facie step is utilized to eliminate the two most common explanations for termination—lack of qualification or the elimination of the position).

Viewing plaintiff's prima facie burden through the appropriate lens, there is no dispute that she has satisfied her prima facie case. This aspect of defendants' motion is denied.


B.     *The Pretext Analysis*

Because plaintiff has satisfied her burden of establishing a prima facie case of discrimination, the court turns to whether defendants have met their burden to articulate a legitimate, nondiscriminatory reason for plaintiff's discharge. "This burden is one of production, not persuasion; it can involve no credibility assessment." *Carter v. Pathfinder Energy Servs., Inc*., 662 F.3d 1134, 1149 (10th Cir. 2011) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). The Tenth Circuit has characterized this burden as "exceedingly light," and the court finds that defendants have carried it here. *See id*. According to defendants, plaintiff was terminated after an investigation into plaintiff's expense reports and practices revealed that she had falsified an Expense Report Exception Form and

submitted numerous improper expenses for corporate reimbursement or payment.[4]  The burden

of proof, then, shifts back to plaintiff to show that defendants' proffered reasons are pretextual.

Evidence of pretext "may take a variety of forms," including evidence tending to show

"that the defendant's stated reason for the adverse employment action was false" and evidence

tending to show "that the defendant acted contrary to a written company policy prescribing the

action to be taken by the defendant under the circumstances."  *Id.* at 1150 (quoting *Kendrick*,

220 F.3d at 1230).  A plaintiff may also show pretext with evidence that the defendant had

"shifted rationales" or that it had treated similarly situated employees differently.  *Crowe v. ADT

Servs., Inc.*, 649 F.3d 1189, 1197 (10th Cir. 2011). In essence, a plaintiff shows pretext by

presenting evidence of "weakness, implausibility, inconsistency, incoherency, or contradiction

in the employer's stated reasons, such that a reasonable jury could find them unconvincing."

*Debord v. Mercy Health System of Kansas, Inc.*, 737 F.3d 642, 655 (10th Cir. 2013).   In

determining whether the proffered reason is pretextual, the court examines "the facts as they

appear *to the person making the decision*, not as they appear to the plaintiff."  *Id.* (emphasis in

original).  The court does not "ask whether the employer's proffered reasons were wise, fair or

correct" but only whether "the employer honestly believed those reasons and acted in good faith

upon those beliefs."  *Id.*

In an effort to show that defendants' proffered reason is unworthy of belief, plaintiff

asserts that Abbott treated male employees more favorably for violations of work rules of

---

[4] Plaintiff argues that Abbott, by providing background information about prior occasions on which plaintiff was counseled for expense violations, has offered a post-hoc rationalization for the termination decision or has changed its rationale over time to "shore up" the termination decision.  Plaintiff's characterization is not supported by the record.  Abbott has consistently maintained that plaintiff was terminated for the reasons indicated in Ms. Fendel's report.

comparable seriousness.  *See Smothers v. Solvay Chems., Inc*., 740 F.3d 530, 540 (10th Cir. 2014) ("A plaintiff may . . . show pretext . . . by providing evidence that he was treated differently from other similarly-situated, nonprotected employees who violated work rules of comparable seriousness.").  Specifically, plaintiff alleges that Abbott treated four similarly situated male employees more favorably than it treated her—Mr. Rex; Greg Toole; Ken Davis; and T.J. Brinkerhoff.  According to plaintiff, Mr. Rex was not terminated despite his role in approving the improper expenses for which plaintiff was terminated; Greg Toole was not terminated despite the fact that he understated his personal mileage on his company car for reimbursement; Ken Davis was not terminated for using his corporate credit card for personal expenses; and T.J. Brinkerhoff was not terminated for violating Abbott's policy prohibiting an employee from hiring his or her relative.  As will be explained, the court concludes that no reasonable jury could draw an inference of discrimination based on Abbott's treatment of these individuals.

The court begins with Mr. Rex.  Plaintiff's comparison to Mr. Rex is not legally relevant because Mr. Rex, as plaintiff's supervisor and a decisionmaker in the disciplinary action at issue, is not similarly situated to plaintiff.  *See Jones v. Denver Post Corp*., 203 F.3d 748, 752-53 (10th Cir. 2000) (nonsupervisory employees generally not deemed similarly situated to supervisory employees with respect to disciplinary matters).  In any event, it cannot be reasonably argued that Abbott's failure to terminate Mr. Rex for approving the improper expenses that plaintiff submitted for corporate reimbursement or payment somehow demonstrates that plaintiff was terminated based on her sex.  It is unconverted that Mr. Rex, despite approving those expenses, did not realize that the expenses were for family meals or

were otherwise improper expenses. His conduct, then, cannot reasonably be construed as comparable in severity to plaintiff's conduct which, as determined by Abbott, involved knowing submission of improper expenses. *Rivera v. City & County of Denver*, 365 F.3d 912, 923-24 (10th Cir. 2004) (comparison to other employees did not create genuine issue regarding pretext where misconduct by other employees could reasonably be viewed as less serious than the dishonesty displayed by plaintiff in falsifying reports). Moreover, plaintiff's argument in no way addresses the fact that plaintiff was also terminated for writing Mr. Rex's name on the Travel Agent Exception Form without Mr. Rex's consent.[5]

Mr. Toole, on the other hand, appears similarly situated to plaintiff in many respects. Abbott determined that Mr. Toole, a sales representative one-step removed from Mr. Rex in the reporting chain, had underestimated his personal mileage and owed Abbott nearly $300.00 in restitution. As with plaintiff, Global Security determined that Mr. Toole violated Principles 5 and 9 of Abbott's Code of Business Conduct. As with plaintiff, Abbott's myHR department recommended the termination of Mr. Toole's employment and, as with plaintiff, Mr. Rex supported the termination decision. Nonetheless, Abbott ultimately decided not to terminate Mr. Toole's employment (instead merely giving him a written warning) because Mr. Comer and

---

[5] Plaintiff focuses briefly on two other incidents involving Mr. Rex that she contends shows Abbott's more favorable treatment of male employees. She contends that Mr. Rex, in 2009, received only a written warning from Mr. Comer for violating "company policy" on sexual harassment when he advised plaintiff not to report an incident of sexual harassment involving one of her co-workers spreading rumors about her. It is undisputed that Abbott was not Mr. Rex's employer at that time; he was employed by Solvay. This incident, then, has no bearing on Abbott's treatment of plaintiff. Plaintiff also contends that Mr. Comer failed to terminate Mr. Rex in 2010 despite the fact that Mr. Rex had used his corporate credit card for personal use. Mr. Rex, however, did not submit personal expenses or other improper expenses to Abbott for direct payment to American Express. This incident, then, cannot be construed as similarly in severity to plaintiff's conduct.

Susan Niver-Percy, the employee relations manager assigned to the case, concluded that Mr. Toole had simply been following what had been accepted practice at Solvay in terms of estimating personal mileage and that Mr. Toole perhaps had not been properly trained on Abbott's policy. Plaintiff's comparison to Mr. Toole, then, clearly does not demonstrate a bias on the part of Mr. Rex, who supported the decision to terminate Mr. Toole. And although Mr. Comer did not push back against plaintiff's termination like he did for Mr. Toole, Mr. Comer confirmed that Mr. Toole's conduct was consistent with Solvay's policies and practices concerning estimating personal mileage, suggesting that he had committed either an honest mistake or needed additional training on Abbott's policy. By contrast, in plaintiff's situation, Mr. Comer confirmed that plaintiff's conduct was not consistent with Solvay's policies and practices concerning family meal expenses. Plaintiff, then, has not shown that she is similarly situated to Mr. Toole in all relevant aspects. *See MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1277 (10th Cir. 2005) (employees not similarly situated if "differentiating or mitigating circumstances" distinguishes their conduct or the employer's treatment of them for it).

While Mr. Davis, like plaintiff, was a District Manager reporting directly to Mr. Rex, there is no evidence that Mr. Davis submitted personal expenses to Abbott for payment to American Express or otherwise submitted improper expenses.[6] Rather, the evidence demonstrates that Mr. Rex had concerns because Mr. Davis consistently used his corporate credit card for personal expenses (but Mr. Davis did not seek to have Abbott pay for those

---

[6] While plaintiff alleges in her affidavit that Mr. Davis improperly submitted expenses for hotel stays incurred in Omaha (Mr. Davis's district) after Mr. Davis should have relocated to Omaha, her evidence on that point lacks foundation and is not admissible.

expenses). Plaintiff, then, has not established that Mr. Davis's conduct was of comparable

severity for purposes of drawing a meaningful comparison. *See Cooper v. Wal-Mart Stores,*

*Inc.,* 296 Fed. Appx. 686, 694 (10th Cir. 2008) (other employees not similarly situated where

none of the allegations substantiated against other employees involved offenses as serious as

misappropriation of company funds); *Timmerman v. U.S. Bank, N.A*., 483 F.3d 1106, 1121 (10th

Cir.2007) (affirming district court's conclusion on summary judgment that other employees

were not similarly situated to plaintiff; plaintiff failed to establish that other violations were as

frequent and involved a comparable dollar amount as her own misconduct); *Rivera v. City &*

*County of Denver*, 365 F.3d 912, 923-24 (10th Cir. 2004) (comparison to other employees did

not create genuine issue regarding pretext where misconduct by other employees could

reasonably be viewed as less serious than the dishonesty displayed by plaintiff in falsifying

reports). In any event, Mr. Rex, just like he did in plaintiff's situation, brought his concerns

about Mr. Davis to Abbott's myHR department for guidance.[7]

     Plaintiff has also failed to present evidence of comparable severity with respect to Mr.

Brinkerhoff. It is uncontroverted that Abbott concluded that, based on its investigation, Mr.

Brinkerhoff was not aware that Abbott maintained an Employment of Relatives policy and that

Mr. Brinkerhoff did not believe that hiring his brother-in-law would violate Solvay's policy

---

[7] In a related vein, plaintiff avers that Mr. Rex never "turned in" any of his male District
Managers for expense violations. While she has some evidence that male employees under Mr.
Rex's supervision used their corporate American Express cards for personal expenses, there is
no evidence that these employees attempted to have Abbott pay American Express for those
expenses or otherwise submitted improper expense reports. Without evidence that any male
District Managers committed expense violations similar to plaintiff's violations and that Mr.
Rex was aware of those violations (or that Mr. Rex had reason to be concerned about the
expense reports of any male District Managers), plaintiff's evidence has little probative value.

because they were not blood relatives. A determination was made, then, that Mr. Brinkerhoff did not intend to violate an Abbott policy. There is no evidence in the record that Abbott considered Mr. Brinkerhoff's violation to be as egregious as plaintiff's violations—which included a determination that she had falsified a company document and submitted inappropriate expenses for reimbursement or payment that, in plaintiff's own words, amounted to at least a "few hundred dollars."[8] In addition, Abbott determined that plaintiff's violation was knowing and intentional. In such circumstances, Abbott's treatment of Mr. Brinkerhoff does not tend to show that Abbott's treatment of plaintiff was tinged with discriminatory animus. *See Cooper,* 296 Fed. Appx. at 694; *Timmerman,* 483 F.3d at 1121; *Rivera*, 365 F.3d at 923-24.

Plaintiff also contends that she has established pretext in light of various comments made by Mr. Rex over time. According to plaintiff, Mr. Rex, in February 2012, told one of his male District Managers that "one way to get rid of an employee is to turn them in for expense reporting violations." And she relies, again, on the same comments she highlighted in support of her argument that she possesses direct evidence of discrimination—Ms. Fenton-Oswald's testimony that, more than ten years prior to plaintiff's termination, Mr. Rex stated his belief that women with young children should stay at home with their children if possible; Mr. Rex's expression of concern in April 2009 over whether plaintiff was being "stretched too thin" in light of the fact that she and her husband both worked full-time and had four young children at

---

[8] While both plaintiff's and Mr. Brinkerhoff's case reports were designated as a category "B" in terms of "severity" level, there is no evidence that Abbott's internal designation related to the ultimate findings as opposed to the initial allegations. *See Cooper*, 296 Fed. Appx. at 694 (in similarly situated analysis, relevant evidence focuses on employer's findings and resulting discipline, not unsubstantiated allegations). In fact, the evidence suggests that the severity level is assigned when the case is opened.

home; Mr. Rex's statement to plaintiff during the expense report investigation that she should "focus on her family and her faith" and his desire for assurance that her husband had a good job such that her family would be "okay" if she was terminated; and Ms. Garrett's testimony that she resigned her employment because she was concerned about Mr. Rex's attitude toward working mothers and his apparent concern whether women employees with young children at home could be focused and committed to their jobs.

Mr. Rex's comment about turning in an employee for an expense report violation obviously does not suggest that Mr. Rex forwarded plaintiff's expense report to Human Resources based on plaintiff's sex. The comments attributed to Mr. Rex by Ms. Fenton-Oswald and Ms. Garrett can only be characterized as stray remarks unrelated to the employment decision in this case. Ms. Fenton-Oswald's testimony concerns a time period more than 10 years prior to plaintiff's termination and Ms. Garrett's testimony concerns a time period as long as 18 months after plaintiff's termination. None of the comments concerned plaintiff's employment and plaintiff has not established the requisite nexus between these comments and plaintiff's discharge. *See Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1118 (10th Cir. 2007) (plaintiff must establish a nexus between circumstantial evidence of general bias and the decision to terminate). This is particularly true where there is no evidence that Mr. Rex, at any time after promoting plaintiff to the District Manager position, ever questioned plaintiff's commitment to her job or her ability to focus on her job in light of her status as a working mother. His comment to plaintiff in April 2009 is of little probative value considering that he made the comment or expressed his concern in the context of promoting plaintiff to the District Manager position and there is no evidence he ever expressed that concern again in the three

years leading up to her termination.  Finally, plaintiff fails to explain how Mr. Rex's advice to her that she "focus on her family and her faith" and his request for assurance that her husband had a good job evidences a bias against women in the workplace.

Nonetheless, even if Mr. Rex forwarded his concerns about plaintiff's expense report to Abbott's myHR department based on plaintiff's sex (or if the remark he made to plaintiff during the investigation concerning her husband's job and that she should focus on her family and her faith is sufficient to suggest gender bias on the part of Mr. Rex), Ms. LaFleur, after an undisputedly independent and thorough investigation by Ms. Fendel and after independently assessing the facts herself, recommended the termination of plaintiff's employment.  That independent review constrained any improper motive by Mr. Rex and plaintiff does not allege any improper motive on the part of Ms. LaFleur or Ms. Fendel.  *See Macon v. United Parcel Service, Inc.*, 743 F.3d 708, 715 (10th Cir. 2014) (when supervisor's ability to make employment-related decisions is contingent on the independent affirmation of a higher-level manager or review committee, proper focus is on the final decisionmaker).  No credible argument can be made that Ms. LaFleur or Ms. Fendel "rubber stamped" Mr. Rex's concerns or acted as a conduit for Mr. Rex's allegedly discriminatory intent.  While it is true, as plaintiff highlights, that Mr. Rex could have attempted to "overrule" the termination decision, the key here is that Ms. LaFleur did not follow the allegedly biased recommendation of Mr. Rex but that Mr. Rex followed the uncontrovertably unbiased recommendation of Ms. LaFleur.

Finally, plaintiff attempts to show pretext by highlighting the "unfairness" of Abbott's decision to terminate her employment.  Viewing the evidence in the light most favorable to plaintiff, Abbott's termination decision does seem unfair and maybe even unwarranted.  Plaintiff

never attempted to hide the fact that she was submitting receipts for numerous entrees.  Mr. Rex routinely approved those expenses over the course of several years (although there is no evidence that he did so knowingly); Abbott never attempted to determine whether other employees shared plaintiff's understanding of the T&E policy as it related to expensing family meals; and she insists that Mr. Hudson confirmed her understanding of the expense policy as it relates to family meals.   Plaintiff's evidence, then, supports the conclusion that plaintiff did not knowingly or intentionally violate Abbott's T&E policy with respect to the family meal expenses and that her actions  may have been consistent with other employees' understanding of the policy.  With respect to the Travel Agency Exception Form, plaintiff's evidence supports the conclusion that she did not intend to "falsify" that document; she knew that Mr. Rex would see the form and she wrote his name on the form to expedite the approval process.  Plaintiff also complains that Abbott never investigated Mr. Rex for his role in plaintiff's expense practices, although he was counseled to pay closer attention to the expenses and underlying receipts that were submitted by his direct reports.

　　　None of these facts, however, suggests that Abbott terminated plaintiff's employment based on her sex or that its stated reasons for terminating plaintiff are not credible.  As aptly summarized by the Tenth Circuit:

> Under *McDonnell Douglas*, [the court's] role isn't to ask whether the employer's decision was wise, fair or correct, but whether it honestly believed the legitimate, nondiscriminatory reasons it gave for its conduct and acted in good faith on those beliefs.
>
> That individuals and companies sometimes make employment decisions that prove to be bad ones in hindsight usually suggests no more than that—that they got it wrong.  To support an inference of pretext, to suggest that something more nefarious might be at play, a plaintiff must produce evidence that the employer did

more than get it wrong. He or she must come forward with evidence that the employer didn't really believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory agenda. This is because Title VII licenses [the court] not to act as a "super personnel department" to undo bad employment decisions; instead it charges [the court] to serve as a vital means for redressing discriminatory ones.

*Johnson v. Weld County, Colorado*, 594 F.3d 1202, 1211 (10th Cir. 2010) (citations omitted).

At most, plaintiff here has demonstrated that Abbott may have "gotten it wrong" when it terminated her employment. She is not entitled to a jury trial based on such a showing. Indeed, even the arguably most egregious facts in plaintiff's favor—that Ms. LaFleur and Ms. Fendel failed to ascertain whether other employees shared plaintiff's understanding of the policy and that Mr. Hudson actually confirmed plaintiff's understanding of the policy—cannot establish pretext. Because it is undisputed that Ms. LaFleur is the one who recommended the termination of plaintiff after an independent assessment of Ms. Fendel's investigation, and because plaintiff does not allege gender bias on the part of Ms. LaFleur or Ms. Fendel, the fact that they did not attempt to figure out whether other employees shared her understanding of the policy, while surprising and disappointing, does not cast doubt on their stated reasons for terminating plaintiff's employment. Moreover, even assuming that Mr. Hudson confirmed to plaintiff that her understanding of the policy was accurate, in the absence of any evidence that Ms. LaFleur or Ms. Fendel had knowledge that Mr. Hudson did so (and the evidence reflects only that he consistently denied confirming that policy to plaintiff), Mr. Hudson's alleged confirmation to plaintiff of the policy does not tend to suggest that Abbott's stated reasons for terminating plaintiff's employment are unworthy of belief.

## IV. Religious Discrimination Claim

As described in the pretrial order and further fleshed out in plaintiff's summary judgment response, it is the religious beliefs of Mr. Rex, and the fact that plaintiff does not share them, that constitute the basis of plaintiff's religious discrimination claim. In other words, plaintiff does not contend that Abbott discriminated against Catholics, but that she was targeted because she does not share Mr. Rex's religious beliefs and that Mr. Rex is biased against non-Mormons.[9] In such circumstances, the court must apply a modified *McDonnell Douglas* test akin to those used in reverse discrimination cases. *See Shapolia v. Los Alamos Nat'l Laboratory*, 992 F.2d 1033, 1038 (10th Cir. 1993) (because discrimination was targeted against non-Mormons, and non-Mormons constitute a majority of society, case resembles reverse discrimination case requiring modified analysis).

For plaintiff to establish a prima facie case that she was discriminated against because she is not Mormon, plaintiff must show that she was subjected to an adverse employment action; that her job performance was satisfactory at the time of the adverse action; and some additional evidence to support the inference that the adverse action was taken based upon her failure to hold or follow her supervisor's religious beliefs. *Id.*; *DeFreitas v. Horizon Inv. Management Corp.*, 577 F.3d 1151, 1162 (10th Cir. 2009). In essence, plaintiff must "establish background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority." *Shapolia*, 992 F.2d at 1038 n.6. Upon such a showing, plaintiff is entitled to the benefit of the *McDonnell Douglas* burden-shifting scheme. *Id.*

---

[9] While plaintiff identifies herself as a Catholic in the pretrial order and in her summary judgment response, she consistently compares Abbott's treatment of Mormons with its treatment of non-Mormons without any comparison relating to the treatment of non-Catholics.

Viewed in the light most favorable to plaintiff, there is insufficient evidence from which a reasonable jury could infer that plaintiff's discharge was based on the fact that she is not Mormon. The only evidence plaintiff points to that might support the third element of her prima facie case is that Ken Davis and Greg Toole, both Mormons, were not discharged for similar rule violations.[10] Notably, although Mr. Toole was not terminated, the uncontroverted evidence demonstrates that Mr. Rex supported the decision to terminate Mr. Toole but that Mr. Comer, a non-Mormon, overruled the termination decision. And while Mr. Davis was not terminated for his expense violations (violations which were substantively different from plaintiff's violations), Mr. Rex issued a Performance Memo to Mr. Davis and, soon thereafter, supported the decision to terminate Mr. Davis for other misconduct—misconduct that Mr. Rex himself reported. This evidence, then, does not reasonably support the inference that Mr. Rex favored Mormon employees.

Even if plaintiff could establish the third element of her prima facie case, summary judgment would nonetheless be appropriate on her religious discrimination claim on the grounds that there is simply no evidence suggesting any religious animosity by Mr. Rex toward plaintiff or that her discharge was based in any way on the fact that she is not Mormon. While the evidence reflects that Mr. Rex, on occasion, discussed his Mormon faith with plaintiff in the workplace, such evidence does not suggest that Mr. Rex discriminated against plaintiff because she is not Mormon. In so concluding, the court finds the Tenth Circuit's decision in *DeFreitas* particularly instructive. In *DeFreitas*, the plaintiff's supervisor and most of the employees at her

---

[10] As noted earlier, the court concludes that Mr. Brinkerhoff is not similarly situated to plaintiff and is thus not an appropriate comparator.

workplace were Mormon while plaintiff was not. 577 F.3d at 1156. The plaintiff testified that her supervisor discussed religion openly in the workplace; provided her with religious literature; joked about converting her; repeatedly told her that "hiring return missionaries would be a good idea" as "they made good salespeople because they sold the Book of Mormon" and "would help improve the persona of the office." *Id.* The plaintiff further testified that her supervisor suggested that she attend church to meet friends and keep her spirit up and remarked that "good Mormon girls stay home after they have children." *Id.* at 1157. Finally, the plaintiff's supervisor replaced her with a Mormon employee upon the plaintiff's termination. *Id.*

The Tenth Circuit affirmed the district court's grant of summary judgment on the plaintiff's religious discrimination claim, noting that despite some evidence that the employer's reasons for the termination were not credible, her evidence of religious discrimination was insufficient to support the inference that her supervisor fired her because of the fact that she was not Mormon. *Id.* at 1164. As summarized by the Circuit:

> But regardless of whether Mr. Terry's remarks can be interpreted as displaying partiality to members of his faith, it would not be reasonable to draw an inference that he fired Ms. DeFreitas because of her religion. The uncontradicted evidence is that her Catholicism was known throughout her tenure with Horizon, yet Mr. Terry had treated her well. In some 21 months he had given her two raises—the second of which was more than a 1/3 increase in salary—and had given her praise as well as increasing responsibilities. Ms. DeFreitas points to nothing with religious overtones that occurred during her final months with Horizon that could account for any religious animosity by Mr. Terry toward her. In light of this history, it simply beggars the imagination to believe that she was fired on religious grounds.

*Id.* The evidence in *DeFreitas* that the Circuit found lacking is much stronger than the evidence set forth by plaintiff in this case. As such, plaintiff's evidence is not sufficient to permit a reasonable inference that Mr. Rex terminated plaintiff's employment (or failed to overrule the

termination decision) based on the fact that plaintiff is not Mormon.[11]  Summary judgment on

this claim is granted.


## V.      Retaliation Claim

Title VII makes it unlawful for an employer to retaliate against an employee because he

or she has opposed any practice made an unlawful employment practice by those statutes.  42

U.S.C. § 2000e–3(a).  Plaintiff asserts in the pretrial order that defendants terminated her

employment in retaliation for her complaints, raised during the investigation into her alleged

expense violations, that she was being "singled out" and treated differently than other employees

who followed the same expense practices as plaintiff.  The court assesses plaintiff's retaliation

claim under the *McDonnell Douglas* framework.  *Daniels v. United Parcel Serv., Inc*., 701 F.3d

620, 638 (10th Cir. 2012).  To state a prima facie case for retaliation, plaintiff "must show (1)

[s]he engaged in protected opposition to discrimination, (2) a reasonable employee would have

considered the challenged employment action materially adverse, and (3) a causal connection

existed between the protected activity and the materially adverse action."  *Id.* (quoting *Hinds v.*

*Sprint/United Mgmt. Co*., 523 F.3d 1187, 1202 (10th Cir. 2008)).  If plaintiff presents a prima

facie case of retaliation, then defendants must respond with a legitimate, nonretaliatory reason

for the challenged action.  *Debord v. Mercy Health Sys. of Kansas, Inc*., ___ F.3d ___, 2013 WL

---

[11] While there is evidence in the record that the other individuals involved in the termination decision were aware that plaintiff was not Mormon, there is no evidence whatsoever that those individuals considered or even mentioned plaintiff's religion (or any other religion) at any time. In fact, the remaining decisionmakers are, like plaintiff, non-Mormon.

6170983 (10th Cir. Nov. 26, 2013). Plaintiff, then, must show that defendants' stated reason is pretextual. *Id.*

In their motion for summary judgment, defendants contends that summary judgment is warranted on plaintiff's retaliation claim because the evidence viewed in the light most favorable to plaintiff demonstrates that she did not engage in protected activity and that no causal connection exists between any alleged protected activity and the termination of plaintiff's employment. Defendants further argue that the record evidence is insufficient to permit a reasonable jury to conclude that defendants' proffered reasons for plaintiff's termination are pretextual. Because no reasonable jury could conclude that plaintiff engaged in protected opposition to discrimination, the court grants summary judgment on plaintiff's Title VII retaliation claim and declines to address defendants' additional arguments.

Plaintiff contends that she engaged in protected opposition to discrimination in two respects during the investigation into her alleged expense violations. First, she contends that she left a voicemail message for Mr. Comer, with a copy to Mr. Rex, in which she stated: "I know I am not alone in [my] understanding and application of the meals-while-traveling policy. I am also aware that Abbott has recently given others who were in fact guilty of blatant violations of company policy multiple opportunities and chances." Second, she contends that she advised Ms. LaFleur that she was being "treated differently than other employees" and was being "singled out." She further testified that she told Ms. LaFleur that there were "other people who have done what I have done."[12]

---

[12] Plaintiff also directs the court to an email that plaintiff sent to Ms. LaFleur following the termination of her employment. The substance of this email is the same as her testimony

Plaintiff's voice mail message to Mssrs. Comer and Rex and her statements to Ms. LaFleur are not examples of protected opposition to discrimination. Nowhere in her voice mail message or her comments to Ms. LaFleur does plaintiff mention or allude to gender discrimination or religious discrimination. "Although no magic words are required, to qualify as protected opposition the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful" by Title VII. *See Hinds v. Sprint/United Management Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008). At most, plaintiff's evidence reflects a complaint that she was being treated differently from all other employees in the workplace regardless of the gender or religious beliefs of those employees—that she was being "singled out" from everyone else. In fact, she concedes in her deposition that when she told Ms. LaFleur that she felt like she was being treated differently from other employees, she believed that she was being treated differently from other women and other non-Mormon employees as well as from males and Mormon employees. With respect to her voice mail message, she avers that she was "referring to Ken Davis," who is a Mormon male employee, and that she "knew that [Mssrs. Comer and Rex] would know that I was talking about Ken Davis because he had just left the company." Plaintiff's statement that she "knew" that Mssrs. Comer and Rex "would know" that she was referring to Mr. Davis is rank speculation. *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1225 (10th Cir. 2007) (mere conjecture insufficient to defeat summary judgment).

---

concerning her conversations with Ms. LaFleur during the investigation—she asserts that "others" have not been investigated or terminated for similar violations. But even if plaintiff had raised concerns about gender or religious discrimination in this email to Ms. LaFleur, the email could not support a prima facie case of retaliation because it was written after plaintiff's termination. *Sabourin v. University of Utah*, 676 F.3d 950, 958-59 (10th Cir. 2012) (retaliation claim necessarily fails where termination decision occurs before protected activity).

Because plaintiff has not come forward with sufficient evidence from which a reasonable jury could conclude that she engaged in protected opposition to discrimination, the court grants summary judgment in favor of defendants on plaintiff's Title VII retaliation claim.

## VI.  FMLA Claims

The FMLA allows a qualified employee to take up to twelve weeks of leave during a twelve-month period in order to care for a son or daughter if such son or daughter has a serious health condition.  *Brown v. ScriptPro*, LLC, 700 F.3d 1222, 1226 (10th Cir. 2012) (citing 29 U.S.C. § 2612(a)(1)(C).  The FMLA provides that an employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]."  *Sabourin v. University of Utah*, 676 F.3d 950, 957 (10th Cir. 2012) (quoting 29 U.S.C. § 2615(a)(1)).  An employer's violation of this provision gives rise to an "interference" claim under the FMLA.  *See Brown*, 700 F.3d at 1226.  The FMLA also forbids an employer from retaliating against an employee for taking FMLA leave.  *Smothers v. Solvay Chem., Inc.*, 740 F.3d 530, 539-40 (10th Cir. 2014) (citing 29 U.S.C. § 2615(a)(2)).  An employer's violation of this provision gives rise to a retaliation claim under the FMLA.  *Id.* at 540.  Plaintiff asserts both claims in the pretrial order.

## A.  *Interference Claim*

Plaintiff contends that defendants interfered with her rights under the FMLA by terminating her employment while she was taking intermittent FMLA leave.  To establish her FMLA interference claim, plaintiff must demonstrate that she was entitled to FMLA leave; that

some adverse action by defendants interfered with her right to take FMLA leave; and that defendants' action was related to the exercise of her FMLA rights. *See Brown*, 700 F.3d at 1226. A deprivation of these rights is a violation regardless of the employer's intent and the *McDonnell Douglas* burden shifting analysis does not apply. *Id*. at 1226-27 (citations omitted). An employer can defend against the claim, however, by showing that the employee would have been terminated regardless of the request for FMLA leave. *Id*. at 1227.

Defendants do not dispute that plaintiff has satisfied the first two elements required to establish her FMLA interference claim. Indeed, it is undisputed that plaintiff was entitled to leave and that her employment was terminated during the period when she was taking intermittent leave. Defendants move for summary judgment on the grounds that plaintiff cannot establish that defendants' decision to terminate plaintiff's employment was related to plaintiff's exercise of her FMLA rights and, in any event, plaintiff undisputedly would have been terminated regardless of her taking intermittent leave. Because plaintiff has not come forward with sufficient evidence from which a jury could conclude that her termination was related to the exercise of her FMLA rights, the court grants summary judgment on this claim and need not address defendants' remaining argument.

In concluding that plaintiff's evidence does not suggest that her termination was related to her leave, the court first emphasizes that plaintiff's claim is somewhat unique both because of the particular leave at issue—intermittent leave of just a few hours each week—and because it is undisputed that plaintiff was granted all of the leave which she requested. Thus, while plaintiff was, in a technical sense, "on leave" when her termination occurred, this case is distinguishable from those cases in which courts have found the "related-to" issue easily resolved because the

termination occurs while the employee is away from work for weeks at a time or soon after the employee has notified the employer of the need for such leave. *Compare DeFreitas v. Horizon Inv. Management Corp.*, 577 F.3d 1151, 1159-60 (10th Cir. 2009) (when termination occurs while the employee is on leave, or soon after a request for leave, timing may be sufficient evidence that termination is related to leave) *with Nealey v. Water Dist. No. 1 of Johnson County*, 324 Fed. Appx. 744, 750-51 (10th Cir. 2009) (affirming summary judgment on FMLA interference claim; no causal relationship between termination and FMLA leave where employee was frequently advised to take FMLA leave and was consistently granted FMLA leave). Here, plaintiff's leave amounted to just a few hours each week and plaintiff's requests for intermittent leave were granted each time. *See Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287-88 (10th Cir. 2007) (FMLA interference claim is based on an employer's alleged denial of an employee's FMLA rights, including a wrongful refusal to grant leave or to reinstate the employee following leave; FMLA retaliation claim typically accrues when the employee successfully takes leave and is adversely affected by an employment action following a return to work).

Moreover, no inference of causation can be reasonably drawn based on the timing of plaintiff's termination in relation to her FMLA leave. While plaintiff urges that she was terminated within 4 weeks of her most recent intermittent leave on February 10, 2012 and within 3 weeks of her February 19, 2012 e-mail requesting an extension of her intermittent leave, she directs the court to no case supporting the principle that a termination closely on the heels of what amount to a few hours of intermittent leave is sufficient to establish a causal relationship between the termination and the FMLA leave. Indeed, the majority of courts to address the

issue have held that the appropriate measure of temporal proximity in FMLA cases begins on the day that FMLA leave is requested or granted. See *Colburn v. Parker Hannifin/Nichols Portland Division*, 429 F.3d 325, 337-38 (1st Cir. 2005); *Hall v. Ohio Bell Tel. Co.*, 529 Fed. Appx. 434, 441 (6th Cir. 2013) (measuring temporal proximity from first FMLA leave request); *Basch v. Knoll, Inc*., 2014 WL 911865, at *5 (W.D. Mich. Mar. 10, 2014) (measuring temporal proximity from date when plaintiff first took FMLA leave rather than when she last took FMLA leave because earlier leaves did not result in any adverse action); *Wallner v. J.J.B. Hilliard, W.L. Lyons, LLC*, 2013 WL 5934145, at *(W.D. Ky. Nov. 5, 2013) ("better reasoned approach" in measuring temporal proximity in FMLA cases "looks instead to the date on which the employee requests FMLA leave"). *Peterson v. One Call Concepts, Inc*., 2005 WL 2406033, at *3 (D. Minn. Sept. 29, 2005) ("temporal proximity is generally measured between the request for, or beginning of, FMLA leave and the adverse employment action.").

In *Colburn*, the plaintiff requested and was granted intermittent leave for migraine headaches. 429 F.3d at 327. Between October 2001 and January 31, 2002, the plaintiff missed 25 days of work for intermittent leave. *Id*. He was terminated on January 31, 2002 and his most recent use of intermittent leave occurred just 2 days prior to his termination. *Id*. at 328. Affirming the district court's grant of summary judgment on the FMLA retaliation claim, the Circuit disregarded the fact that the plaintiff was fired "within days" of using intermittent leave and focused instead on the fact that the plaintiff requested and was granted leave in early October 2001 and was not terminated until almost four months later, "after he had taken more than twenty-five days of leave." *Id*. at 337-38. According to the First Circuit, that chronology of events raised no inference of retaliatory motive. *Id*. at 338.

Following the reasoning of *Colburn* and the majority of other cases addressing the issue, temporal proximity in this case is measured from November 7, 2011—the date on which plaintiff sought and was approved for FMLA leave—to March 8, 2012, the date of her termination.  Without more, this four-month period is insufficient to establish a causal relationship between her FMLA leave and her termination.  *See Proctor v. United Parcel Service*, 502 F.3d 1200, 1208 (10th Cir. 2007) ("Four months is too large a time gap to establish a causal connection.").  As in *Colburn*, the fact that plaintiff used intermittent leave on numerous occasions over that four-month period, including within 4 weeks of her termination, does not alter the causation analysis—particularly as plaintiff's use of intermittent leave on those occasions drew no negative reaction from her employer in any respect.[13]

Significantly, plaintiff has no other evidence from which a jury could infer a relationship between her FMLA leave and her termination.  It is undisputed that most of the decisionmakers in this case had no knowledge that plaintiff had requested or was taking intermittent leave under the FMLA.  Plaintiff does not dispute that Ms. Ballard, Ms. Fendel and Ms. LaFleur simply did not know about plaintiff's leave status in any respect.  *Mann v. Navicor Group, LLC*, 488 Fed. Appx. 994, 1001 (6th Cir. 2012) (affirming summary judgment on interference claim; employer's decision to terminate employment was unrelated to FMLA leave where there was no evidence decisionmaker was aware of leave request); *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1236 (11th Cir. 2010) (unrebutted evidence that decisionmaker was not aware of leave

---

[13] For the same reasons, the fact that plaintiff requested an extension of her intermittent leave in February 2012 does not affect the temporal proximity measurement.  *See Hall*, 529 Fed. Appx. at 441 (measuring temporal proximity from first of several FMLA leave requests where earlier requests did not result in any adverse action).

request establishes as a matter of law that the termination was for reasons other than requested FMLA leave). Because it is undisputed that these key decisionmakers were not aware of plaintiff's FMLA leave, plaintiff's interference claim depends solely on Mr. Rex and Mr. Comer. But even to the extent Mssrs. Rex and Comer are deemed decisionmakers, there is simply no evidence that either one considered plaintiff's FMLA leave status in either initiating the investigation into plaintiff's expense practices or in failing to "overrule" the termination decision.

Plaintiff does not dispute that when she first contacted Mr. Rex in November 2011 to request time off from work, Mr. Rex was entirely supportive of the request; encouraged plaintiff to "take what time you need;" encouraged plaintiff to "be there" for her boys; and noted that he would call the employee leave department to let them know that she would be contacting them to explore her options. He further encouraged plaintiff to apply for FMLA leave and to call defendants' toll-free HR hotline for assistance in ascertaining what other resources might be available to help plaintiff in light of the circumstances. Plaintiff has come forward with no evidence suggesting that Mr. Rex was ever annoyed by her leave status, inconvenienced by plaintiff's leave status or in any way had any negative views about plaintiff's leave status. There is no evidence that plaintiff experienced any negative feedback or reaction from Mr. Rex when she took intermittent leave or that she was ever criticized for or questioned about taking leave from work.[14] And while it is undisputed that Mr. Rex, with plaintiff's knowledge, advised

---

[14] For these reasons, and in the absence of any other evidence suggesting that plaintiff's termination was related to her FMLA leave, no reasonably jury could infer causation based solely on the fact that Mr. Rex submitted plaintiff's expense reports for investigation two-and-one-half months after plaintiff's initial leave request.

Mr. Comer about plaintiff's intermittent leave status, the record is devoid of any evidence concerning Mr. Comer's reaction to that information.

Because plaintiff has failed to set forth evidence from which a jury could conclude that her taking of intermittent leave under the FMLA constituted a negative factor in the decision to terminate her employment, summary judgment on this claim is appropriate.[15]

B.    *Retaliation Claim*

Unlike FMLA interference claims, FMLA retaliation claims are subject to the burden-shifting analysis of *McDonnell Douglas*. *Brown v. ScriptPro, LLC*, 700 F.3d 1222, 1229 (10th Cir. 2012) (citations omitted).  To establish a prima facie case of retaliation, plaintiff is required to show that "(1) the employee engaged in a protected activity, (2) the employer took an action that a reasonable employee would have found materially adverse, and (3) there is a causal connection between the protected activity and the adverse action." *Id*.  If a plaintiff establishes her prima facie case, "the burden shifts to the employer to demonstrate a legitimate, nonretaliatory reason for termination." *Id*. (citation omitted).  To avoid summary judgment, "the employee must show that there is a genuine dispute of material fact as to whether the employer's reasons for termination are pretextual." *Id*. (citation omitted).

---

[15] Plaintiff contends in her response that Mr. Rex did not scrutinize the expense reports of employees who were not taking FMLA leave, suggesting that because Mr. Rex treated similarly situated employees differently, some inference of pretext can be drawn.  To the extent that a pretext analysis is even pertinent in the context of an FMLA interference claim, that argument would be pertinent only as it relates to defendants' affirmative defense demonstration.  Because the court grants summary judgment without reaching defendants' affirmative defense, the court does not reach plaintiff's pretext argument.  *See Brown v. ScriptPro, LLC*, 700 F.3d 1222, 1228 (10th Cir. 2012) (no pretext analysis necessary on FMLA interference claim; arguments suggesting pretext analyzed in connection with affirmative defense).

As described by plaintiff in the pretrial order, her FMLA interference claim and her FMLA retaliation claim are, in substance, the same.  With respect to both claims, plaintiff alleges that defendants, because plaintiff exercised her FMLA rights, terminated her employment while she was taking intermittent leave.  The fact that plaintiff's interference claim mirrors her retaliation claim is not unusual.  *See Sabourin v. University of Utah*, 676 F.3d 950, 961-62 (10th Cir. 2012) (noting that the substance of an FMLA interference claim is often the same as an FMLA retaliation claim); *James v. Hyatt Regency Chicago*, 707 F.3d 775, 781 (7th Cir. 2013) (plaintiff's FMLA retaliation claim was "really just a reformulation of his FMLA interference claim").

Thus, for the same reasons that plaintiff cannot establish that her termination was related to her exercise of her FMLA rights for purposes of her interference claim, she cannot establish that a causal connection exists between her termination and her exercise of her FMLA rights for purposes of her retaliation claim.  *See Ransel v. CRST Lincoln Sales, Inc*., 2014 WL 1207432, at *5 (N.D. Ind. March 24, 2014) (analyzing interference and retaliation claims together because both claims required the plaintiff to establish that his exercise of his FMLA rights was a motivating factor in the termination decision).  The only additional fact that plaintiff sets forth with respect to her FMLA retaliation claim is that she sent a text to Mr. Rex six weeks prior to her termination in which she told him that she was in the early stages of another pregnancy.[16] The substance of this text message stated:

> You may recall that Bryan and I have been taking steps to expand our fabulous family.  We found out today that I'm pregnant with our 5th (yikes!) child!  It's still

---

[16] Obviously, defendants could not have interfered with FMLA leave that plaintiff had not yet requested and did not yet need.

very very early (7 weeks) so we're not telling anyone other than the essential folks right now. We don't anticipate any issues, but I am old, so there's always the possibility that things won't progress as planned. I'll keep you posted.

Mr. Rex sent a text in response, which simply said, "Congratulations!!"

This additional fact is not sufficient for plaintiff to survive summary judgment on her FMLA retaliation claim. Contrary to plaintiff's argument, the substance of her text message cannot be read as a request for leave and, accordingly, there is no evidence that she engaged in protected activity by virtue of the text message. And even if the message could somehow be construed as a request for leave or as an exercise of her FMLA rights, no reasonable jury could conclude that plaintiff's employment was terminated based on this leave request as the record reflects that plaintiff's pregnancy ended in miscarriage before defendants terminated her employment. In other words, at the time of her termination, none of the decisonmakers had reason to believe that plaintiff was going to require maternity leave in the near future.

For the foregoing reasons, the court grants summary judgment in favor of defendants on plaintiff's FMLA retaliation claim.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' motion for summary judgment (doc. 78) is granted.

**IT IS SO ORDERED.**

Dated this 13th day of May, 2014, at Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge